THE MERCHANTS BUILDING IMPROVEMENT COMPANY

*v.*

THE CHICAGO EXCHANGE BUILDING COMPANY.

*Opinion filed April 20, 1904—Rehearing denied June 9, 1904.*

1. CONTRACTS—*subscription agreement does not require formal delivery.* A subscription agreement is not of that class of contracts which requires a particular or formal delivery.

2. SAME—*acceptor of subscription agreement need not be in esse when subscription is made.* It is not necessary that the acceptor, or person who is to perform the act for or toward which the subscription is intended, shall be *in esse* at the time the subscription is made.

3. SAME—*performance is only acceptance necessary to subscription contract.* Subscription contracts, being calculated to encourage public and *quasi* public improvements, are favored in law, and performance is the only acceptance or notice of acceptance required.

4. SAME—*when failure to give notice does not defeat recovery on a subscription contract.* Failure to give formal notice of certain matters mentioned in a subscription contract by a corporation does not defeat a recovery of the subscription, where the corporation, through its president and secretary, had actual notice and knowledge of all matters it would have been apprised of by formal notice.

5. SAME—*subscription contract construed.* A provision in a subscription contract that the signer will pay a certain sum per year during the time a certain corporation shall occupy the specified floor space in a building to be erected, "said occupation to be continuous and free from rent and said payments not to continue beyond the period of fifteen years," does not require the corporation shall execute a building lease for fifteen years, but limits the subscriber's liability to the time of actual occupation, not exceeding fifteen years.

6. SAME—*what not a departure from terms of a subscription contract.* Requiring a corporation to pay one dollar a year as consideration for a lease of premises worth $30,000 a year rental is not a violation of the terms of a subscription contract providing that the occupancy of the corporation shall be rent free.

7. SAME—*what constitutes ownership "of the premises," within meaning of subscription contract.* Where a subscription is specified to be paid "to the owner or owners of the premises where said stock exchange is located," ownership of the building and of the space therein occupied by said stock exchange is sufficient compliance with the specification, although the building is on leased ground.

*Merchants Bldg. Co.* v. *Chicago Bldg. Co.* 106 Ill. App. 17, affirmed.

WRIT OF ERROR to the Branch Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

This is an action of assumpsit growing out of a certain contract entered into in the latter part of the year 1892, wherein negotiations were pending between parties variously interested in relation to the erection of an office building at the south-west corner of LaSalle and Washington streets, in Chicago.

It appears that Ferdinand W., Clarence I., Walter L. and Anna Peck were the owners of one hundred feet square cornering on the said LaSalle and Washington streets, and that William A. Fuller was the owner of eighty by one hundred feet adjoining the Peck property on the south, and that a scheme was devised for the erection upon both of these properties of a large, modern office building. The Pecks, or some of them, had an option for a lease on the Fuller property. Plaintiff in error owned and occupied an office building on the northwest corner of the crossing of the two streets named, and directly north, across the street, from the site of the proposed building. Ferdinand W. and Clarence I. Peck, as representatives of the Pecks and as promoters for the construction of the proposed new building, sought out plaintiff in error, the Chamber of Commerce, and other owners of buildings in the vicinity of the proposed new building and interested in the project, and to that end suggested a scheme or plan for obtaining the Chicago Stock Exchange,—an organization of business men of about six hundred persons, conducting the business of trading in stocks,—to occupy and become a tenant of the proposed new building, upon the theory that the business of the Chicago Stock Exchange would attract renters and occupants, not only for the proposed new building, but for the other buildings in that vicinity, and to that

end it was proposed, as an inducement to the stock exchange to locate in and occupy a part of the proposed building, to offer it at least six thousand square feet of floor space on the first or second floor of the proposed new building, rent free, for a term not exceeding fifteen years. Proposing this plan to property owners in that vicinity, the Pecks sought from them subscriptions of such amounts as they were willing to give to the owners of the proposed new building to in part compensate such owners for the use of the floor space that should be occupied by the stock exchange, rent free, for said period. The value of the use of this space to be occupied by the stock exchange was from $30,000 to $50,000 per year. Plaintiff in error, under the inducement made, executed the writing or subscription out of which this suit arises, and which is as follows:

"Whereas, an effort is being made to secure the location of the Chicago Stock Exchange in a building to be erected upon lot one (1) and the east part of lot two (2), in block fifty-five (55), original town of Chicago, with a view of benefiting property interests in that vicinity, and in order to induce it to locate there it will be necessary to offer a large amount of valuable office and room space, not less than six thousand (6000) square feet, free of rent, therefore it is proposed to erect upon said land a new fire-proof building, with quarters adapted to the purpose of the Chicago Stock Exchange, and to furnish the same to it as stated:

"Now, therefore, we, the undersigned, owners of buildings in the neighborhood of said property, do severally agree to pay, annually, the sums set opposite our respective names for and during the time that said Chicago Stock Exchange shall actually occupy the entire space of six thousand (6000) square feet, or more, on the first or second floor, or both, of said proposed building, as its general stock exchange room in which its stock exchange business is transacted, said occupation to be continuous and free of rent, and said payments are not to continue beyond the period of fifteen (15) years; said payments to be in consideration of the benefits to us of such location, and to be paid in equal quarterly installments to the owner or owners of the premises where said stock exchange shall be located, upon satisfactory evidence being given as to who said owners may be,

when required, towards providing a fair rental to the owners of the property for the space to be occupied by the stock exchange free of rent, provided one of the main entrances to said main stock exchange room shall be from Washington street. Said building to be erected and occupied by said stock exchange on or before January 1, 1895.

"Merchants Building Improvement Company, by W. F.
    Furbeck, president......................... .........$2500
        Attest: WALLACE HECKMAN, *Secretary.*"

At about the time of receiving the above subscription contract it appears that Clarence I. Peck, attorney, and one of the Peck heirs, executed and delivered to plaintiff in error the following receipt, to-wit:

"CHICAGO, ILLINOIS, *December 2, 1892.*

"This is to certify that the undersigned has received from the Merchants Building Improvement Company and the Chamber of Commerce Safety Vault Company, subscriptions, each in the sum of $2500 per annum, for fifteen years, on certain conditions, toward providing space on the west side of LaSalle street, between Washington street and Calhoun place, for the Chicago Stock Exchange, free of rent. We hereby agree, in the event that we do not enter into a written contract binding upon the Chicago Stock Exchange to occupy said premises in accordance with the terms of the said subscription, and notify the said subscribers thereof before May 1, 1893, then the said subscription shall be null and void and the subscription paper above mentioned shall be returned to the respective subscribers.

        ESTATE OF P. F. W. PECK,
          By CLARENCE I. PECK, *Att'y.*"

After the execution of the above subscription paper the defendant in error corporation was, on April 27, 1893, organized and incorporated, and the Pecks became the owners of most, if not all, of the stock of that corporation. The Pecks then executed to said corporation a lease for that portion of the ground belonging to them, and assigned the option of the Pecks to a lease from Fuller for the Fuller property, upon which a lease by Fuller to the corporation for ninety-nine years was made. To the Pecks the corporation was to pay $50,000 per year as ground rent, and to Fuller $10,000 for the first year and $30,000 per year thereafter. To this corporation the

subscription signed by plaintiff in error was delivered by Clarence I. Peck, who had received it from plaintiff in error. The Stock Exchange building was then constructed by the defendant in error corporation upon the lands above mentioned, and a contract was obtained from the Chicago Stock Exchange by which it was to occupy nearly twelve thousand feet of floor space on the second floor of said building for a period of fifteen years, beginning April 1, 1894. The contract, as drawn, was for the nominal rent of one dollar per year. The building was constructed and the Chicago Stock Exchange took possession according to contract. Defendant in error claiming to have met all the conditions of the subscription agreement, and plaintiff in error failing and refusing to pay the subscription, two suits were brought. Plaintiff in error pleaded the general issue. No point is made upon the pleadings, it being stipulated that the defense could introduce in evidence any defense it could have made by special pleas. The trial was before a jury, and a verdict was rendered in favor of the plaintiff, defendant here, for the full amount due at the bringing of the suits. The suits were consolidated and tried as one suit, though there were separate verdicts covering the different periods of time. It was stipulated by the parties that the cause should be appealed as one case and heard upon one record.

PECK, MILLER & STARR, HECKMAN, ELSDON & SHAW, and TENNEY, McCONNELL, COFFEEN & HARDING, for plaintiff in error.

JOHN S. COOPER, and CHARLES M. OSBORN, for defendant in error.

Mr. JUSTICE RICKS delivered the opinion of the court:

At the close of plaintiff's evidence, and at the close of all the evidence, the defendant (plaintiff in error) asked a peremptory instruction to find for the defendant, and

the first question presented is whether there is evidence tending to support the material allegations in plaintiff's declaration.   Plaintiff in error contends that the peremptory instruction should have been given upon numerous grounds, which will be examined in the order they are presented.

It is said the subscription agreement was limited and restricted by the receipt given by Clarence I. Peck at the time of the delivery of the subscription to him; that both constituted contemporaneous writings forming part of the same contract, are to be read together, and that the receipt agreement, which plaintiff in error terms "the subscription condition," was not complied with.   We think some confusion has arisen by the use of the term "Peck estate," so frequently mentioned and forcefully dwelt upon by plaintiff in error and often used by the witnesses in testifying in this case.   It appears that long prior to any of the agreements involved in this suit P. F. W. Peck died owning a large estate, which passed to his four sons, Walter L., Clarence I., Ferdinand W. and Harold S. Peck; that they took the property as tenants in common and that it remained undivided; that after the death of the father the son Harold S. died, leaving his widow, Anna, who was his sole devisee and executrix of his will, and that at the time of the inception of the matters out of which this suit arises, the three sons, and Anna, the daughter-in-law, widow of Harold S., were the owners of the property termed the "Peck estate."   It also appears that the sons, who operated and managed their property interests largely together, had an office in the Auditorium building, and that Anna Peck, the one-fourth owner of the property one hundred feet square at the corner of Washington and LaSalle streets, had her separate office on Madison street, and that Charles H. Gould was her representative; that as relates to this case, the Peck estate means the tenants in common of the last named tract.   Aside from the lands held in common by the four

persons above named, there seem to have been matters properly pertaining to the estate of P. F. W. Peck which were transacted by the Peck brothers at the Auditorium. The Peck brothers were active in obtaining the subscription from plaintiff in error and from other persons. There is no evidence tending to show that Ferdinand W., Walter L. or Anna Peck, or the defendant in error, had any knowledge of the receipt agreement, or "subscription condition," as it is termed, until after the erection of the defendant in error's building and its occupancy by the Chicago Stock Exchange, other than what would be imputed to them or it or implied from the knowledge of Clarence I. Peck, who executed said subscription condition, purporting to act as the attorney for the Peck estate and who became the president of defendant in error at its organization. There is no evidence in the record tending to show that the Peck estate, as such, was authorized, by will or other form of trust, to engage in undertakings such as are here involved, or that Clarence I. Peck was its attorney or authorized in any manner to bind it. The subscription was not to the Peck estate, but was to any person or corporation that could give satisfactory evidence of ownership of the premises where the Chicago Stock Exchange,—not the Stock Exchange building,—should be located. The subscription receipt or subscription condition was not delivered or put in circulation with and as a part of the subscription, and was not to be delivered with and as a part of the subscription, but purports on its face to be a private agreement made between the plaintiff in error and the Peck estate, through Clarence I. Peck, under the designation of its attorney, and held by plaintiff in error, and if binding at all it would be upon the Peck estate.

The subscription is not of that class of agreements that requires a particular or formal delivery. It is not necessary that the acceptor, or person who performs the act or does the thing for or toward which the subscrip-

tion is to go, shall be *in esse* at the time the subscription is made. (*Cross* v. *Pinckneyville Mill Co.* 17 Ill. 54; *Johnston* v. *Ewing Female University*, 35 id. 518; *Richelieu Hotel Co.* v. *Military Encampment Co.* 140 id. 248.) By placing it in the hands of Clarence I. Peck, the plaintiff in error made him its agent to deliver or communicate it to the world, or to any person or corporation that would comply with it. It made or contained on its face no reference to any condition or requirement other than those expressed therein. When the defendant in error corporation was organized this subscription paper was turned over to it, and it had no knowledge of the supposed subscription condition until the building was completed, occupied by the Chicago Stock Exchange, and a demand made upon plaintiff in error for one of the installments of subscription.

The contention that the subscription was a contract between the Peck estate and plaintiff in error cannot be admitted. Plaintiff in error assumes this false premise, and then argues that the contract being to the Peck estate, defendant in error took it *cum onere*. The contract was between plaintiff in error and defendant in error if defendant in error performed according to the terms of the subscription, and the performance was the acceptance, and the only acceptance by it, that was necessary. When apprised of the subscription, if defendant in error performed it the minds of the parties did meet as a matter of law. These subscription contracts are favored in law, and are calculated to foster and encourage public and *quasi* public enterprises, and have, as to the matter of delivery, acceptance and performance, been looked upon and construed upon the same principle as rewards for the arrest of criminals, and other similar matters made by proclamation or by newspaper advertisement, and performance is the only notice of acceptance required.

Actual notice to defendant in error of the supposed condition was a question of fact, with which we are not

to deal. We are not disposed to hold, as a matter of law, that the knowledge that Clarence I. Peck, purporting to act for the Peck estate in a matter that did not pertain to that estate, had agreed to a condition that, as to the Peck estate, would affect the subscription in question, before defendant in error had any existence, and, so far as is shown by the evidence, was not at the time in contemplation, was such notice to the defendant in error, at its incorporation and entering upon the performance of the subscription contract, as bound it by the condition. The subscription paper does not state that it was to be performed by or ran to the Peck estate, or was relative to lands that could be denominated as of the Peck estate, but shows on its face that it was for a building upon land nearly half of which was other than that of the Peck estate, and was to the owner of the premises in which the Chicago Stock Exchange should be quartered.

The particular respects in which plaintiff in error claims that defendant in error has not complied with the alleged subscription condition are, that defendant in error did not make a binding lease with the Chicago Stock Exchange requiring that the latter should occupy the Stock Exchange building for fifteen years, and did not notify plaintiff in error thereof before May 1, 1893. The evidence shows that on January 16, 1893, the three Peck brothers and Anna Peck made a contract, in writing, with the board of managers of the Chicago Stock Exchange, by which the former agreed to organize a corporation to take leases of the ground and erect a modern fire-proof office building on the site where the building was actually built, and attached to the agreement a plan of the building showing the particular space to be occupied by the said stock exchange, being more than six thousand square feet of floor space, and said stock exchange agreed that when said corporation was organized and could transact business, a lease should be executed, setting out the terms and conditions, for a term of fifteen.

years from May 1, 1894; that the corporation was organized April 27, 1893, and a formal lease between defendant in error and said stock exchange was duly executed on May 1, 1893, providing that said stock exchange should occupy said building for the term of fifteen years from May 1, 1894; that the building was completed and the stock exchange began to occupy the space allotted to it May 1, 1894, and has ever since so occupied the same; that plaintiff in error's secretary, Mr. Heckman, who signed the subscription, between December, 1892, and May 1, 1893, was active in co-operating with the Peck brothers in soliciting and getting other subscriptions to the same enterprise and was fully conversant with the progress and steps of the plan, and the evidence tends to show that plaintiff in error, through both its president and secretary, had notice and knowledge of all the matters that it could have had by formal notice, and if the subscription condition were a part of the contract we could not, as a matter of law, say defendant in error failed in that regard.

We are unable to adopt the view that either the subscription agreement or subscription condition required the defendant in error to make a lease with the Chicago Stock Exchange that should be binding for fifteen years. The subscription is, that plaintiff in error will pay, annually, the sum set opposite its name for and during the term the Chicago Stock Exchange shall actually occupy the entire six thousand feet on the first or second floor, or both, of said proposed building, said occupation to be continuous and free of rent and said payment not to continue beyond the period of fifteen years. The fifteen years specified in the subscription is a limitation as to time of plaintiff in error's liability, but is not a requirement to be performed by obtaining a lease for fifteen years. The payments were to be quarterly, and whenever the stock exchange ceased to occupy the building and space plaintiff in error's liability to pay ceased, and

if the stock exchange continued to occupy over fifteen years plaintiff in error's liability ceased at the end of fifteen years. If the subscription were upon the terms claimed, we regard the lease made by the Chicago Stock Exchange as binding upon it for the period named in the lease; and though the lease provides for an annual rental of one dollar, the evidence shows that defendant in error refused to receive any rent when tendered, and that the stock exchange has all of said time occupied the building free of rent. We do not regard the provision for the payment of one dollar per annum as a violation of the terms of the subscription, where the evidence tends to show the rental value of the space occupied to be $30,000 per annum. Defendant in error was entitled to have a lease requiring the stock exchange to preserve the property and observe the rules of a paying tenant, although rent should not be exacted.

It is said defendant in error failed to prove performance of the proviso to the subscription, which is: "Provided one of the main entrances to said stock exchange room shall be from Washington street." By the subscription the stock exchange might be located on the "first or second floor, or both." It was located on the second floor. There was an entrance from Washington street, easy of access and leading through spacious halls to the stairways to the stock exchange room; also one from LaSalle street. Whether the entrance from Washington street was such a main entrance as was required by the subscription was a question of fact, and not of law, and the trial court, under proper instructions, found against the contention of the plaintiff in error as to it, and the Appellate Court affirmed the finding.

Plaintiff in error insists that defendant in error, having but a leasehold interest in the land on which defendant in error's building is situated, is not an owner of the premises and does not come within the language of the subscription, and therefore is not entitled to perform the

conditions of the subscription and insist upon payment by plaintiff in error. The language of the subscription is, "to be paid in equal quarter-yearly installments to the owner or owners of the premises where said stock exchange shall be located." Plaintiff in error seems to ignore the language of the contract, and proceeds with its argument upon the theory that the contract is such that the defendant in error should be the owner of the premises upon which the building is located. Such is not the language, but it is, that the defendant in error shall be the owner of "the premises where said stock exchange shall be located." The stock exchange is located in the building owned by defendant in error, and the only question of law presented is whether the term "premises" applies only to land, or whether it may be properly held to apply to the building occupied by the stock exchange and covered by its lease. By the lease defendant in error demises to the stock exchange "the premises situated in the city of Chicago, county of Cook, as follows: That certain space on the main floor, being the first above the street floor and on the second floor of the building to be erected by the said party of the first part on the southwest corner of LaSalle and Washington streets, in the city of Chicago, and which space, being about seventy feet by one hundred and one feet, including walls, as indicated upon the plans hereto attached and made a part hereof, as space for the Chicago Stock Exchange, and so marked, said space to include a gallery for spectators, and partitions, as shown on said plans, dividing said space so as to provide room or rooms therein for the secretary, and for other purposes in connection with the business of the said party of the second part." Under this lease and under the subscription agreement it was not necessary that defendant in error should be the owner of the lot upon which the building was located, but it is sufficient that it was the owner of the building and the space occupied by the Chicago Stock Exchange. The

term "premises" may or may not include land, but may be held to mean only the right, title or interest conveyed, and its exact meaning, when found in contracts and conveyances, must be determined according to the intention of the parties as ascertained from the contract and the facts and circumstances attending its making. (22 Am. & Eng. Ency. of Law,—2d ed.—1175, and authorities cited in note 2, p. 1176; *Holbrook* v. *Debo*, 99 Ill. 372.) Defendant in error was the owner and in control of the building and the space leased to the Chicago Stock Exchange, and for all practical purposes, as related to tenants and occupancy, was the owner of the premises.

We deem it unnecessary to enter into a discussion of the contention that the subscription contract and its performance were *ultra vires* the charters of plaintiff in error and defendant in error. Defendant in error was organized "to render aid in the formation and maintenance of organizations in the city of Chicago for the transaction of public business in public exchanges," and plaintiff in error was by its charter authorized to improve, re-construct, etc., the office building where it was conducting business, for its own exclusive benefit, "and to do all things incident to the conducting of such business." We think that the matters here involved were within the charter powers of the parties. *Richelieu Hotel Co.* v. *Military Encampment Co. supra; Central Lumber Co.* v. *Kelter,* 201 Ill. 507.

Complaint is made of the admission of evidence and the giving and refusing of instructions, but as the case was tried, the evidence taken and the jury instructed upon the theory of the case which accords with the views of this court as expressed in this opinion, we deem it unnecessary to extend this opinion by a discussion of the several matters.

From our view of the record there is no such error as calls for a reversal, and the judgment of the Appellate Court is affirmed. *Judgment affirmed.*